IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAMI MITRI, | ) | 1:10-cv-538  AWI SKO |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **ORDER ON DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| WALGREEN CO., INC. dba | ) | **JUDGMENT** |
| WALGREENS, and DOES 1 to 20, | ) | |
| inclusive, | ) | |
| | ) | (Doc. No. 14) |
| **Defendants.** | ) | |
| _____ | ) | |

        This case was removed from the Fresno County Superior Court on the basis of diversity.

Plaintiff Sami Mitri ("Mitri") alleges one cause of action against his former employer, Defendant

Walgreen Company, Inc. ("Walgreens").  Mitri alleges a single California state law cause of

action for wrongful termination in violation of public policy.  Walgreens now moves for

summary judgment.  For the reasons that follow, Walgreens's motion will be denied.


### FACTUAL BACKGROUND[1]

        Walgreens is a national retailer and pharmacy chain.  DUMF 1.  Walgreens employs

_____

[1] "DUMF" refers to Defendant's Undisputed Material Fact, and "PUMF" refers to Plaintiff's Undisputed
Material Fact.  "DRPUMF" refers to Defendant's Response to Plaintiff's Undisputed Material Fact.  Additionally,
the parties together have submitted nearly 200 proposed "undisputed material facts."  To resolve this motion, it is not
necessary to address every proposed undisputed fact.  To the extent that an undisputed fact is not utilized, the fact is
either unsupported by the cited evidence or unnecessary to the resolution of this motion.

pharmacists and other pharmacy employees who fill customer prescriptions.  DUMF 2.  Mitri

began working for Walgreens as a pharmacist in 1996, and was later promoted to a pharmacy

manager in the Fresno District.  See DUMF 3.  Throughout his employment, Mitri regularly

worked as a pharmacist at a number of Walgreens's stores in and around the area of Fresno,

California, i.e. "the Central Valley."  See id.; PUMF 4.  Mitri was employed by Walgreens as an

at-will employee.  See id.  When Mitri was terminated on January 8, 2010, Mitri was the

pharmacy manager at a Walgreens store in Fresno, California.  See PUMF 3.

At the time of his termination, Mitri was employed as a "non-exempt" employee.  DUMF

4.  This meant that Mitri was compensated on an hourly basis, and was entitled to overtime pay

for any hours worked in excess of eight hours per day, or forty hours per week.  See id.  Mitri's

regular pay rate as a Pharmacy Manager was $64.75 per hour, and his overtime pay was $97.13

per hour.  See DUMF 5.

In 2006, Mitri worked 1,118 hours of overtime in addition to his regular shifts.  DUMF 6.

In 2007, Mitri worked 1,014.5 hours of overtime in addition to his regular shifts.  See id.

However, much of this overtime was affirmatively scheduled and involved a new store where

there were only 2 pharmacists who worked 10 hours shifts, and worked a 7 days on, 7 days off

schedule.  See Mitri Depo. 132:8-134:5; PUMF 127.  In 2008, Mitri worked 500 hours of

overtime due in large part to a change in work schedules.  See Mitri Depo. 133:4-10.

Beginning in 2008, Walgreens in the Fresno District undertook an effort to reduce

expenses, including the amount of overtime worked by all employees.  DUMF 7.  As part of this

effort, Walgreens's managers were encouraged to monitor the overtime of all employees, and to

ensure that employees did not work beyond their scheduled shifts.  See id.  At least as early as

2008, Walgreens Fresno District Manager Robert Guillen ("Guillen") spoke to Mitri on several

occasions about the importance of Mitri adhering to Mitri's scheduled shifts.  See DUMF 8.

However, Adrian Olivares ("Olivares"), the Walgreens store manager at Mitri's last store, was

never told to monitor Mitri's hours.  PUMF 156.  Prior to August 2010, Olivares "never did" and

"never had to" monitor the pharmacists' hours.  See Olivares Depo. 78:19-79:8; PUMF 157.

Olivares's policy was to leave it to the pharmacists to decide what was required for customer

service.  See  PUMF 158.  Pharmacists stayed past their closing "occasionally," but Olivares

didn't pay attention to it prior to receiving an e-mail in August 2010, and his practice had been

not to tell the pharmacists to go home.  See PUMF 159.

In early 2008, Mitri made a claim to Walgreens that he had worked "off the clock" for

hours for which he had not been paid.  DUMF 9.  On February 8, 2008, Walgreens and Mitri

entered into a "General Release Agreement" (the "Release") by which Walgreens paid Mitri a

sum of money in return for a full release of any and all claims, known and unknown, existing as

of February 8, including any claims for work "off the clock," i.e. without recording the time that

Mitri worked/working while not clocked in.  See DUMF 10; PUMF 117; PUMF 118.  The

Release stated in part:

> Walgreens's policies prohibit an employee from working before he or she has
> 'clocked in' on his or her timecard.  By signing this [Release], Mitri
> acknowledges that he understands this policy and agrees that in the future he will
> work at times when he has been scheduled to work and has clocked in.  Mitri
> further understands and acknowledges that the failure to do so could result in
> discipline, up to and including termination.

PUMF 118; DRPUMF 118.  As part of the Release, Mitri also was told to record all of his hours.

PUMF 119.  Mitri asked Walgreens Senior Attorney Chris Murray ("Murray") if there were

exceptions to this portion of the release.[2]  See Mitri Depo. 91:12-19.  Murray responded that

"emergencies happen," and that sometime during the emergencies Mitri should get the

permission or approval of the supervisor or someone over Mitri.  See id. at 91:20-25.

In April 2009 (and at various times thereafter), Mitri raised complaints about what he

believed to be improper or fraudulent billing practices by pharmacy employees that could

constitute Medicare fraud.  See DUMF 26; PUMF's 46, 47.  Mitri was concerned about the use

of "old fashioned IOU labels" (hereinafter "IOU labels"), which is a practice used to bill the full

amount for partially filled prescriptions.[3]  See  PUMF 72; Warinner Depo. 34:25-35:23.

---

[2]Murray was a senior attorney in Employee Relations for Walgreens, where his duties included counseling
Walgreens' managers about employment decisions.  PUMF 16.

[3]Creating an IOU label shows as a complete fill on the system, while telling the patient that they are owed
additional pills/medicine.  See PUMF 73.  These labels fool Walgreens's system into billing the insurance company
for the full prescription, and is fraudulent.  See PUMF 74.  Through the billing process, there was an economic
incentive for the pharmacists to fool the billing system with the IOU labels.  See  PUMF's 75-77.

Specifically, a pharmacist partially fills a prescription, but bills for the entire prescription after creating a label that shows the amount that is "owed" to the customer.  PUMF 71.  Mitri reported his concerns to various officers of Walgreens, and was advised to contact either Loss Prevention, his store manager, or the Pharmacy Supervisor Chris Scalzitti.[4]  See PUMF's 48-49.  Based on what he was taught in a recent training program, and because he was concerned that Scalzitti was responsible for the type of improper billing at issue, Mitri contacted Loss Prevention.  See PUMF 50.  Mitri also reported the fraud to Walgreens Market Vice President Robert Hasty.[5]  See PUMF 54.  Mitri was placed in touch with Loss Prevention Supervisor Lisa Warinner.[6]  See id. Mitri also made a complaint to the Department of Health and Human Services and to the California Department of Health Care at the end of April or first half of May 2009.  PUMF 70. Scalzitti is unsure of the timeline, but he knew that Mitri had raised the issue of IOU labels in March, April, or May.  See PUMF 56.  However, Scalzitti testified that he would have known prior to May 11 that Mitri had come to Walgreens about the IOU labels.  See Scalzitti Depo. 27:19-23.

On May 6, 2009, Mitri attended a conference call while on vacation.  See Mitri Depo. 266:2-14; Mitri Depo. Ex. 12.  Mitri did not identify himself on the call because he joined after the roll had been taken.  PUMF 105.  Mitri learned about the call from his pharmacy technician, and believed that his store manager, Viviana Lares, wanted him to participate.  See PUMF's 104, 106.  The notice for the conference call was for "all" pharmacy managers, and two weeks previously, Lares asked Mitri to attend a conference call on Mitri's day off.  See PUMF 107. There was no written policy prohibiting off-duty pharmacists from attending such calls.  PUMF 108.  After the call, Mitri spoke to Lares and explained that he did not want to be paid, but that

---

[4]As the Pharmacy Supervisor for the Central Valley of California, Scalzitti was Mitri's immediate supervisor.  PUMF 12.

[5]Hasty was the supervisor of District Manager Guillen.  PUMF 15.

[6]At all relevant times, Walgreens had in place policies that required prescriptions be billed accurately, and that prohibited any type of fraudulent billing.  DUMF 25.  Walgreens's policies encouraged employees to report any concerns regarding pharmacy operations, including billing practices.  See id.  These policies also stated that employees will not be subjected to retaliation for raising such concerns.  See id.

he wanted her to know that he was on the call so that he couldn't get in trouble for "working off

the clock." PUMF's 109, 115.  Mitri was concerned about "working off the clock" because of

the Release, which prohibited him from working off the clock.  PUMF 116.  Lares told him to

call on Saturday when she did payroll.  PUMF 110.  Lares did not recommend that any action be

taken against Mitri for the call.  PUMF 111.  Lares was not aware that there were any issues with

Mitri's clocking in, and she recognized that Mitri did his best to increase profits.  PUMF 113.

On May 11, 2009, Mitri was given a final written warning (the "Final Written Warning").

See Mitri Depo. Ex. 12.  Mitri, Scalzitti, and Guillen were present at the meeting where the Final

Written Warning was given.  See id.  Under the "Basis for Discipline" section of the Final

Written Warning, it reads "Violation of Company Policies & Procedures."  See id.  Under the

"explanation of the reason for the discipline" section, it reads:

> On May 6th, [Mitri] attended a conference call while on vacation.  When roll call
> was conducted, [Mitri] failed to identify himself as present on the call.  After the
> call concluded, [Mitri] called his store manager asking to be paid.
>
> In addition, you have previously received clear instruction from the District
> Manager and Pharmacy Supervisor that you are not to work beyond your
> scheduled shift.  Despite the prior warning, you have continued to clock in before
> the start of your shift and continue working beyond your scheduled shift.
>
> Your conduct in working off the clock and working beyond your scheduled shift
> goes against Walgreens policies and procedures and creates liability for the
> company.  We realize that emergency situations sometimes will arise that require
> you to work beyond your scheduled shift; or to perform work for the benefit of
> Walgreens before you have checked in.  In those or any other situations in which
> you believe that you need to take action that violates our policies and procedures
> you must get approval from the Pharmacy Supervisor, District Manager, or Store
> Manager.  Any further unauthorized violations of Walgreens policies or
> procedures will result in your immediate termination.

Id.  The Final Written Warning was signed by Scalzitti, Guillen, and Mitri.[7]  See id.  Under the

"optional employee response to discipline" section, Mitri responded: "I was not on the

conference call [until] after roll was taken.  Mrs. Lares said that I should call her Saturday AM &

she would figure it out then."  Id.  Neither Scalzitti nor Guillen explained any concerns over

reducing overtime, rather, they only mentioned "liability."  PUMF 121.  Mitri asked at the

meeting what the Final Written Warning meant by "come in early."  See Mitri Depo. 125:22-

---

[7]Lares never learned that Mitri had been written up for the conference call.  PUMF 112.

126:10.  Scalzitti answered that Mitri could "come in approximately 10 to 15 minutes early to prepare for the opening of your shift as well as have your coffee."  Id.  Mitri also asked what to do if a customer came in 5 minutes prior to closing.  See id. at 126:24-127:13.  Scalzitti replied that Mitri was to e-mail him (Scalzitti), and that if Mitri did not hear back, then Mitri was not to stay.  See id.  So Mitri understood Scalzitti's response to mean that Mitri could not stay beyond the shift unless Scalzitti responded with approval to an e-mail.  See id.  Mitri also told Scalzitti that other pharmacists hadn't worked their scheduled shifts, but Scalzitti said that they were not there to discuss anyone other than Mitri and that he did not know about other pharmacists.  See PUMF 144; Mitri Depo. 241:9-24.

Walgreens has a written "progressive discipline policy" for employees.  See Scalzitti Depo. Ex. 51.  The policy states that it is not a contract of employment between Walgreens and its employees.  Id.  Nevertheless, the policy states that rules and standards are to be communicated to employees.  Id.  The policy states that "Employees must be disciplined in a fair and consistent manner for similar violations of policy or rules."  Id.  The policy states that, in most instances, an employee should not be terminated for a single misdeed or failure to meet a standard, unless the employee engaged in "serious misconduct."[8]  Id.  The policy states that, in cases in which immediate termination is not called for, the following steps "should" be followed: counseling (verbal warning), written warning, final written warning or suspension, and discharge. Id.  Finally, the policy indicates that the showing of favoritism or "the uneven application" of the various forms of discipline must be avoided.  Id.

Scalzitti indicated that he was trained to document whatever disciplinary action is taken. See Scalzitti Depo. 40:20-25.  However, Scalzitti did not see any written documentation that indicated that Mitri had been given any warning for working beyond his shift before issuing the Final Written Warning.  See id. at 42:7-12.  Scalzitti testified that he relied on what Murray and Guillen told him about Mitri prior to the Final Written Warning.  See id. at 42:13-22.  However, Mitri had never been warned prior to the Final Written Warning about working beyond his

---

[8]The policy lists several examples of "serious misconduct" that justifies immediate termination.  See Scalzitti Depo. Ex. 51.  None of Mitri's purported violations justified immediate termination.  PUMF 98.

schedule.  PUMF 101.[9]

After the Final Written Warning, Mitri had concerns that Scalzitti may have been indicating that Mitri should work off the clock, and he made further inquiries with Walgreens. See Mitri Depo. 136:20-137:11.  Murray responded to Mitri's concerns in a May 27, 2009, letter. See Mitri Depo. Ex. 16.  Murray indicated in part that Walgreens supported the discipline issued, i.e. the issuance of the Final Written Warning.  See id.  Murray said that Mitri was permitted to remain 10 to 15 minutes after his shift if it was necessary to take care of customers, and so long as Mitri either e-mailed Scalzitti or let his store manager know that Mitri had worked past the shift.  See PUMF 131.  Similarly, in June 2009, Mitri met with Hasty and Pharmacy Director Robbie Jacobs.  DUMF 16.  During that meeting, it was discussed again what action Mitri should take if he was working with a customer at the end of his shift.  Id.  Mitri testified that Jacobs and Hasty told him to "go ahead and take care of the customer, and then e-mail [Scalzitti] or your store manager or the three people that were listed on the [Final Written Warning]."  Id.  When asked whether he needed to advise either the store manager, or Scalzitti, or Guillen if he had stayed 10 or 15 minutes after his shift to help a customer, Mitri responded, "And I always did, and in most cases, it was the manager on duty at the store as I was clocking out."[10]  Mitri Depo. 147:3-9.

---

[9]Walgreens disputes PUMF 101 by arguing that it is contrary to three undisputed pieces of evidence.  See DRPUMF 101.  First, Walgreens states that Mitri had been told by Scalzitti's predecessor to do a "better job" at "sticking to" his scheduled shifts.  See Mitri Depo. 123:18-24.  However, there are no further details provided. Mitri testified that he was "asked," not warned, and it is unknown what is meant by "sticking to."  Moreover, there is no evidence that this incident constituted a formal verbal warning.  Second, Walgreens relies on the Release. However, the Release came about as a result of claims made by Mitri for working "off the clock," and the language of the Release appears to be geared to "working off the clock."  In fact, the portion of the Release quoted by Walgreens omits words.  Walgreens quotes the Release as follows: "in the future [Mitri] will work at times when he has been scheduled to work . . . ."  DRPUMF 101.  The full quote without omitted words reads, "in the future [Mitri] will work at times when he has been scheduled to work and *has clocked in*."  PUMF 118 (emphasis added).  It is not at all clear that the Release deals with "working beyond the scheduled shift," i.e. clocking in early and/or clocking out late.  Finally, Walgreens relies on DUMF 11 and the assertion that Mitri had a conversation with Murray wherein Murray told Mitri to get permission from his supervisor if he had to work beyond his shift.  However, DUMF 11 relies on Mitri's deposition, and the cited deposition excerpt deals with Mitri asking Murray about the Release. Specifically, Mitri asked if there were exceptions to the Release and what to do in emergencies, to which Murray replied that Mitri was to get permission.  See Mitri Depo. 90:8-91:25.  DUMF 11, as worded, is unsupported by the cited evidence.  Accordingly, PUMF 101 is not sufficiently disputed for purposes of this motion.

[10]On five occasions between June 13, 2009, and November 27, 2009, Mitri sent e-mails to Scalzitti that Mitri was required to work beyond his shift to help a customer, and Scalzitti approved.  See PUMF 17.

In June 2009, Warinner investigated the invoices that Mitri had supplied in connection with Mitri's complaints of billing/Medicare fraud through the use of IOU labels.  See PUMF's 51-52.  By June 2, 2009, Scalzitti knew that Mitri had produced IOU labels to Warinner.  PUMF 60.  Scalzitti then did a "sweep" for such labels.  PUMF 61.  Scalzitti also learned in the Summer of 2009 that Mitri had met with Hasty about Medicare fraud.  PUMF 62.

Mitri's billing fraud claims were determined to be founded.  See Warinner Depo. 34:22-24.  Warinner's investigation initially found problems with 6 stores, but Warinner later learned that 12 out of the 30 stores that Warinner investigated had problems with IOU labels.  See PUMF's 80-81.  Walgreens instituted several remedies based on what it discovered as a result of Mitri's complaints.  PUMF 82.  Walgreens required new training for pharmacists regarding partially filling prescriptions and the impropriety of IOU labels, and ordered that payment be reversed for any prescription that had involved a "partially filled" order.  See DUMF 28; PUMF 83; Malusa Depo. 14:20-15:3.

In the Fall of 2009, Mitri advised Warinner that he had found further examples of IOU labels in the Visalia store.  See PUMF 63.  In September 2009, Mitri showed Guillen evidence of the improper IOU labels, although Guillen did not understand that the labels constituted billing fraud.  See PUMF 65.  In October 2009, Scalzitti was told by Warinner that Mitri found more labels.  See PUMF 64; DRPUMF 64.

On December 15, 2009, Mitri sent an e-mail to Guillen and Scalzitti.  See Mitri Depo. Ex. 36.  Mitri stated that he wanted to talk about a training course on medicare fraud and waste that Walgreens was requiring its store and pharmacy managers to take.  See id.

On December 26, 2009, Scalzitti received an e-mail from Mitri which stated that Mitri saw "things done against company policy with regards to Medicare and Medicaid fraud, waste, and abuse at every store that I work at," and that Mitri had "specific examples" of his concern. PUMF 32.  Mitri's concern at that time was that he had to complete a Walgreens training program on "Medicare Fraud, Waste and Abuse Training" no later than December 31, 2009. PUMF 33.  Specifically, Mitri was concerned that by signing off on that training, he would be acknowledging that he did not know of any violations of policy or insurance fraud, when in fact

he did know of such fraud.  See id.  Although Scalzitti acknowledged that completing the

program was "extremely important," and also knew that Mitri was concerned about affirming his

compliance with Walgreens's fraud policy while the investigation into Medicare fraud was on-

going, neither Guillen nor Scalzitti contacted Mitri to discuss his concerns.  PUMF 35.

On December 28, 2009, Scalzitti sent an e-mail reply to Mitri.  See Mitri Depo. Ex. 36.

Scalzitti apologized for not getting back with Mitri sooner, and stated that Scalzitti had spoken to

Employee Relations and that they were coordinating with Loss Prevention to address Mitri's

complaint.  See id.  However, despite Scalzitti stating that "we are" coordinating with Loss

Prevention, see id., Warinner could not recall ever receiving Mitri's December e-mails, even

though she had investigated Mitri's prior fraud claims and was investigating Mitri's Fall 2009

complaints.  See Warinner Depo. 75:25-76:11.  Nevertheless, Scalzitti contacted Murray about

Mitri's medicare fraud complaint prior to sending the December 28 reply e-mail.  See PUMF 39.

By December 30, 2009, Scalzitti believed that Mitri's complaint had started an investigation.

PUMF 40.

On December 30, 2009, Warinner met with Mitri to discuss the additional evidence of

IOU labels that Mitri had gathered.  See PUMF 66.  Warinner expressed surprise that the issue

had not been resolved by the actions that Walgreens had taken in June.  PUMF 67.  She told

Mitri that Walgreens might have to investigate, and asked Mitri to send her an e-mail detailing

his information.  See id.  Warinner also told Mitri that it was not Mitri's "job to report an

example of fraudulent billing . . . to the government."  Mitri Dec. ¶ 6.[11]  Mitri sent the e-mail to

Warinner, but he never heard back.  See PUMF 68.  The concerns that Mitri raised with

---

[11]Walgreens objects that Paragraph 6 is a "sham declaration" in that the paragraph directly contradicts deposition testimony.  In order for a declaration to be struck as a "sham," the inconsistency between the deposition and the subsequent affidavit "must be clear and unambiguous."  Van Asdale v. International Gaming Tech., 577 F.3d 989, 998-99 (9th Cir. 2009).  At page 63 of his deposition, the following question and answer occurred: "Q: At any time, did any supervisor at Walgreens tell you that if you witness a policy violation or a violation of a law, you should not report it to anyone?  A: Because you said 'anyone,' the answer . . . to your question is, no, I was never told that."  Mitri Depo. 63:3-7.  The Court is not convinced that the declaration is unambiguously inconsistent.  First, it is unknown whether the question is aimed at Mitri's supervisors, and it does not appear that Warinner was Mitri's supervisor.  Second, and more importantly, Mitri qualified his answer by emphasizing that the question used the term "anyone."  Use of the term "anyone," at least by a non-lawyer, could well refer to a living person instead of a governmental agency.  Pages 61 and 62 were not submitted, so the Court has no further context for the question.  As the evidence stands, the Court cannot strike Paragraph 6 as a sham.  See Van Asdale, 577 F.3d at 998-99.

Warinner in December were the same concerns that he had raised with her in April. See PUMF
69.

In late December 2009/early January 2010, following completion of the holiday season,
Scalzitti declares that he reviewed the time records for numerous pharmacy employees, including
Mitri, to determine their level of overtime and compliance with shift schedules. See Scalzitti
Dec. ¶ 4. Based on his review, Scalzitti concluded that Mitri worked beyond his shift without
authorization on numerous occasions. See id. Walgreens's time records indicate that, from
October 27, 2009, to January 1, 2010, there were 20 instances when Mitri either clocked in 10
minutes or more early, or stayed 10 minutes or more beyond his scheduled shift.[12] See DUMF
22. The most common entry on the time records is 10 minutes. See PUMF 91. Of the 20
instances, 10 involved Mitri clocking in 10 to 15 minutes early. See DRPUMF 150. Two
instances when Mitri clocked in 42 minutes early and 19 minutes early had been approved by the
store manager. See PUMF 153; Mitri Depo. 218:10-219:6. Also, two of the instances had been
when the store manager, Olivares, had asked Mitri to come in early (once in November and once
in December). See PUMF 151.

Mitri has declared that the times he worked before or after his schedule between October
31, 2009, through January 1, 2010, were done with the knowledge of the store manager or the
assistant store manager who was acting as the store manager in the store manager's absence. See
Mitri Dec. ¶ 3.[13] Generally, as he was leaving the store, Mitri would tell either the store manager
or the assistant store manager that he had stayed late to help a customer, and he was never told
that he did not have permission to work late. See id. Mitri declared that he had been told by
Walgreens that he would be complying with the policy about working late if he was taking care

---

[12]The 20 occasions total 248 minutes, which is about $450 at Mitri's regular pay rate. See PUMF 93.

[13]Walgreens objects that Paragraph 3 is a "sham" because Mitri testified at page 225 of his deposition that
"it's possible" that he asked permission from the manager on those dates. In order for a declaration to be struck as a
"sham," the inconsistency between the deposition and the subsequent affidavit "must be clear and unambiguous."
Van Asdale, 577 F.3d at 998-99. At Page 147 of his deposition, Mitri indicated that he "always" advised either the
store manager, Scalzitti, or Guillen that he had worked passed his shift. See Mitri Depo. 147:3-9. Mitri testified that
he would usually tell the manager that he had stayed late to help a customer as he (Mitri) was clocking out. See id.
This is perfectly consistent with Paragraph 3. As the evidence stands, the Court cannot find that Paragraph 3 is a
sham. See Van Asdale, 577 F.3d at 998-99.

of a customer and let someone, including the store manager, know that he had worked late.  See id.; see also Mitri Depo. 147:3-9; PUMF 131; DUMF 16.

Discussions between Guillen, Hasty, Murray, and Scalzitti about Mitri's termination first started a day or two before January 5, 2010.  PUMF 21.  On January 6, 2010, Scalzitti e-mailed Murray a list of the 20 instances that Mitri had clocked in early or stayed late.  See PUMF 31.  As part of their collaborative discussions, Guillen, Hasty, Murray, and Scalzitti discussed the subject of Mitri making a complaint of Medicare fraud.  See PUMF's 17, 41.  Guillen, Hasty, Murray, and Scalzitti each declared that they concluded that Mitri's reports of fraud did not excuse the apparent violation of the Final Written Warning.  See Guillen Dec. ¶ 6; Hasty Dec. ¶ 2; Murray Dec. ¶ 2; Scalzitti Dec. ¶ 8.  On January 5, 2010, or early on January 6, 2010, the decision to terminate Mitri was made collaboratively as part of discussions between Guillen, Hasty, Murray, and Scalzitti.  PUMF 20.  Walgreens's basis for terminating Mitri was that Mitri had purportedly worked "beyond his schedule without authorization or approval" in violation of the Final Written Warning.  See DUMF 32; PUMF 86; DRPUMF 86.  Scalzitti testified that the decision to terminate Mitri was based on the facts identified in the January 6 e-mail, Mitri's history, and the Final Written Warning.  See PUMF 88.

On January 6, 2010, Mitri was notified by Scalzitti and Guillen that he was being suspended.  See Mitri Depo. 234:17-235:18.  Mitri was not told why he was being suspended, rather he was simply told that he was under investigation and that he was to clock out, leave the store, and speak to no one who worked for Walgreens until he heard from Scalzitti and/or Guillen.  See id. at 235:16-236:1.  The suspension occurred one week after Mitri gave Loss Prevention some labels that evidenced medicare fraud.  See id. at 234:12-13.  Further, Scalzitti did not start investigating Mitri for "working beyond his scheduled hours" until after Scalzitti received Mitri's December 26, 2009 e-mail, which indicated that Mitri had evidence of medicare fraud occurring at Scalzitti's stores.  See PUMF 23.

At some point, Murray asked Scalzitti to check with the store manager to see if Mitri was authorized to work beyond schedule.  See PUMF 29.  Olivares prepared a written statement dated January 8, 2010, in which Olivares stated that: (1) he asked Mitri to come in early on two

occasions, (2) he never asked Mitri to stay late, (3) sometime in November Mitri asked to stay late, (4) he could remember 1 or 2 other times in which Mitri asked to stay late because the pharmacy was busy, and (5) any other time that Mitri came in early or stayed late was without approval.  See Scalzitti Dec. Ex. B.  Olivares's statement was provided to Murray.  See PUMF 29.  Mitri was not interviewed as part of the investigation that led to the termination.  PUMF 163.

On January 8, 2010, Mitri was notified of his employment termination.  PUMF 18.  Mitri was told that he had deviated from his scheduled shifts.  PUMF 87.  At the time of his termination, Mitri was not given an opportunity to answer the claims made against him or to provide information.  PUMF 164.  Instead, when Mitri sought the opportunity to explain his position, Scalzitti raised his voice and told Mitri that he wanted to get it over with.  See id.

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 573 F.3d 1040, 1058 (9th Cir. 2009); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

## DEFENDANT'S MOTION

### Defendant's Argument

Walgreens argues that Mitri cannot make a *prima facie* case of retaliatory discharge.  The undisputed facts do not establish any causal connection between Mitri's pharmacy billing complaints and his termination.  Instead, the facts show that he was warned verbally and in writing that he could not work beyond his scheduled shift without prior approval, and these warnings were prior to his billing complaints.  Mitri does not dispute that he worked beyond his shift on 20 occasions without obtaining approval from the appropriate supervisors.

Even if Mitri could make a *prima facie* case, Walgreens states that they had a legitimate reason for termination.  Walgreens made management decisions to reduce business expenses and warned Mitri about working beyond his schedule.  In May 2009, Mitri received a final written warning because, despite prior warnings, Mitri was continuing to work beyond his shift.  The Final Written Warning told Mitri that he had to obtain approval to work beyond schedule from either the District Manager, the Pharmacy Supervisor, or the Store Manager.  The Final Written Warning also stated that any further unauthorized violations would result in immediate termination.  Scalzitti determined that between October 27, 2009, and January 1, 2010, Mitri violated the Final Written Warning about 20 times.  Therefore, Mitri was terminated because of his repeated violations of the Final Written Warning.

Further, Mitri cannot establish pretext.  Mitri was counseled about the importance of

adhering to his shift well before he complained about billing practices.  Mitri cannot establish that he was treated differently from any similarly situated employee.  Walgreens has disciplined at least six other Fresno District employees for working beyond their shifts by issuing verbal warnings and final written warnings.  While none of these employees were fired, unlike Mitri they did not violate their final written warnings.  At the time of Mitri's termination, Walgreens had terminated at least seven Fresno District employees for violating final written warnings.  Also, while two Pharmacy Managers were disciplined in 2010 for improper billing practices, Walgreens took no disciplinary action against the employees who complained about the improper billing.  Also, while temporal proximately may support a *prima facie* case of causation, without more it cannot establish pretext.  Since Mitri has no other evidence, temporal proximity is insufficient.  Finally, any argument that Mitri might make that Walgreens erred and got the facts wrong is insufficient.  An employer may fire an employee based on erroneous facts, it just may not fire an employee based on retaliatory animus, and there is no evidence of retaliatory animus.  Thus, there is no evidence that disputes that Mitri was terminated for violating the Final Written Warning by working beyond his schedule.

### Plaintiff's Opposition

Mitri argues that the evidence establishes a prima facie case.  With respect to causation, timing alone can be sufficient.  Here, there was a short period of time between Mitri telling Scalzitti that Mitri had specific examples of billing fraud, and Mitri's termination.  This timing alone sufficiently establishes causation under the *prima facie* case.

In addition to the timing of the termination, Mitri argues that other evidence indicates causation.  First, there is no dispute that the decision makers had knowledge of Mitri's reports, and they considered Mitri's whistleblowing as part of their decision to terminate.  Second, Mitri was treated differently from other pharmacists with respect to warnings, e-mail approval, and termination associated with working beyond schedule.  Third, Walgreens failed to follow their own disciplinary procedures with Mitri because he was not given a warning for working beyond his schedule prior to the Final Written Warning.  Fourth, Walgreens has inconsistent positions regarding how much time Mitri could work beyond his schedule.  Relatedly, Walgreens included

instances in the January 6 e-mail that where within the parameters set by Scalzitti and other Walgreens officers for working beyond schedule. Fifth, Walgreens did not investigate whether Mitri was authorized by his store manager to work off schedule until after the termination decision. Sixth, Walgreens was not even-handed in its rules regarding working beyond schedule. Seventh, that Olivares did not know that Mitri was violating a "working off schedule" policy or that he knew that Mitri had been fired for "working off schedule" implies that there really was no policy about "working off schedule" until it was applied to Mitri. Finally, Walgreens's argument begs the question of why it waited until the end of December/beginning of January to check Mitri's time records. In other words, why did Walgreens wait seven months after the Final Written Warning to check on Mitri?

Mitri also argues that Walgreens has failed to meet its burden of providing a legitimate, non-discriminatory reason for the termination. Walgreens has provided no evidence concerning the reasons why it decided to investigate and terminate Mitri only after it had knowledge that Mitri had specific instances of billing fraud.

Finally, Mitri argues that there is a triable issue of fact whether Walgreens's explanation is pretext. Mitri argues *inter alia* that the timing of the termination and Walgreens's knowledge of Mitri's complaints, along with lower evaluation scores and the evidence discussed under the *prima facie* showing of causation, establish pretext.

### *Legal Standard*

Under California law, an employer who terminates an employee for a reason that contravenes a fundamental public policy is subject to tort liability. Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 176 (1980). "The central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." Roby v. McKesson Corp., 47 Cal.4th 686, 702 (2009). "Tort claims for wrongful discharge typically arise when an employer retaliates against employee for: (1) refusing to violate a statute, (2) performing a statutory obligation, (3) exercising a statutory right or privilege, or (4) reporting an alleged violation of a statute of public importance." Turner v. Anheuser-Busch, Inc., 7 Cal.4th

16

1   1238, 1256 (1994).

2       When a plaintiff alleges retaliatory employment termination as a claim for wrongful

3   termination in violation of public policy, California follows the burden-shifting analysis of

4   *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).  See <u>Nielsen v. Trofholz Techs., Inc.</u>,

5   750 F.Supp.2d 1157, 1164 (E.D. Cal. 2010); <u>Loggins v. Kaiser Permanente Inter'l.</u>, 151

6   Cal.App.4th 1102, 1108-09 (2007).  In the first phase, the plaintiff bears the burden of

7   establishing a *prima facie* case of retaliation.  See <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal.4th

8   1028, 1042 (2005); <u>Loggins</u>, 151 Cal.App.4th at 1109.  A plaintiff makes a *prima facie* case of

9   retaliation by showing that:  (1) he engaged in a protected activity, (2) the defendant subjected

10   him to an adverse employment action, and (3) there was a causal link between the two.

11   <u>Yanowitz</u>, 36 Cal.4th at 1042.  The timing between the plaintiff engaging in protected conducted

12   and the defendant terminating employment may indicate a sufficient causal connection.  See

13   <u>Loggins</u>, 151 Cal.App.4th at 1112; <u>Morgan v. Regents of University of Cal.</u>, 88 Cal.App.4th 52,

14   69 (2001).  However, the plaintiff must present evidence that the employer was aware that the

15   plaintiff engaged in the protected activity.  <u>George v. California Unemployment Ins. Appeals Bd.</u>,

16   179 Cal.App.4th 1475, 1491 (2009); <u>Morgan</u>, 88 Cal.App.4th at 70.

17       If the plaintiff meets his burden of establishing a prima facie case, the burden shifts to the

18   employer to offer a legitimate, nonretaliatory reason for the termination.  See <u>Yanowitz</u>, 36

19   Cal.4th at 1042.  "A reason is 'legitimate' if it is facially unrelated to prohibited bias, and which

20   if true, would thus preclude a finding of discrimination."  <u>Reid v. Google, Inc.</u>, 50 Cal. 4th 512,

21   520 n.2 (2010); <u>Guz v. Bechtel National, Inc.</u>, 24 Cal.4th 317, 358 (2000).  If the employer

22   produces a legitimate reason for the adverse employment action, the presumption of retaliation

23   drops out of the picture.  <u>Yanowitz</u>, 36 Cal.4th at 1042.

24       "If the employer meets this burden, the [plaintiff] then must show that the employer's

25   reasons are pretexts for discrimination, or produce other evidence of intentional discrimination."

26   <u>Reid</u>, 50 Cal.4th at 520 n.2; <u>Guz</u>; 24 Cal.4th at 356; <u>see also</u> <u>Yanowitz</u>, 36 Cal.4th at 1042.  As

27   has been recently explained:

28       A plaintiff may establish pretext either directly by persuading the court that a

17

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. Godwin, 150 F.3d at 1220.  If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence "must be specific" and "substantial."  Id. at 1221. "An employee in this situation can not simply show the employer's decision was wrong, mistaken, or unwise."  Morgan v. Regents of the Univ. of Cal., 105 Cal. Rptr. 2d 652, 670 (Cal. Ct. App. 2000). "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons." Id.

Department of Fair Empl. & Hous. v. Lucent Techs., Inc., - - - F.3d - - - , 2011 U.S. App. LEXIS 8484, *39-*40 (9th Cir. 2011).  "In appropriate cases, evidence of dishonest reasons, considered together with the elements of the *prima facie* case, may permit a finding of prohibited bias." Guz, 24 Cal.4th at 356.

   *Discussion*

   Because the parties agree that the *McDonnell-Douglas* framework applies to Mitri's single cause of action, the Court will address each phase of the *McDonnell-Douglas* framework.

   1.   *Prima Facie* Case

   Walgreens only challenges the third prong of the *prima facie* showing.  However, Mitri has met his burden of establishing a causal connection.

   There is no dispute that on December 26, 2009, Walgreens received Mitri's e-mail and was therefore aware that Mitri was again making complaints about IOU labels and stating that he had specific evidence.  See PUMF's 32-33.  Mitri met with Warinner about the additional IOU labels on December 30, 2009.  See PUMF 33.  Mitri also provided Loss Prevention with additional evidence concerning IOU labels.  See Mitri Depo. 234:12-13.  Moreover, Hasty, Guillen, Murray, and Scalzitti discussed Mitri's reports/complaints as part of their meetings concerning Mitri's termination.  See PUMF 41.  This shows knowledge of protected activity. See George, 179 Cal.App.4th at 1491; Morgan, 88 Cal.App.4th at 69-70.  Further, there is a very short amount of time between Mitri's December 26 e-mail and his termination (13 days), and an even shorter period of time between the date Mitri produced the labels and his termination (9 days).  Mitri was suspended on January 6, which is only 7 days from the date that Mitri produced

the labels to Loss Prevention.  See Mitri Depo. 234:12-14.  In some cases, timing and knowledge can establish a sufficient causal link for purposes of the *prima facie* case.  See Loggins, 151 Cal.App.4th at 1012; Morgan, 88 Cal.App.4th at 69-70; see also  Villiarimo v. Aloha Island Air, Inc. 281 F.3d 1054, 1065 (9th Cir. 2002).  The Court believes this to be such a case.  The timing of Mitri's termination relative to Mitri's December complaints and reporting, combined with Walgreens's knowledge, is sufficient to show a causal connection for the *prima facie* phase.  See id.  Summary judgment on this theory is inappropriate.

### 2.    Nondiscriminatory Reason

Under the second phase of the *McDonnell Douglas* framework, Walgreens has met its burden.  Walgreens states that it terminated Mitri because he violated the Final Written Warning on numerous occasions by "working beyond schedule," i.e. clocking in early or clocking out late. See DUMF32; DRPUMF 86; Guillen Dec. ¶ 6; Hasty Dec. ¶ 2; Murray Dec. ¶ 2; Scalzitti Dec. ¶ 8.  This is a facially legitimate, non-discriminatory reason.  See Guz, 24 Cal.4th at 358.

### 3.    Pretext

Viewing the evidence in the light most favorable to Mitri and making all reasonable inferences in his favor as the non-moving party, see Stegall, 350 F.3d at 1065, the totality of the evidence produced is sufficient to create a genuine, material dispute regarding pretext.

First, as discussed above with respect to the *prima facie* phase, Walgreens had knowledge of Mitri's reports, and there is a very short period of time between Mitri's December 26 e-mail, Mitri's December 30 meeting with Loss Prevention, and Mitri's termination on January 8, 2010. See Arteaga v. Brink's, Inc., 163 Cal.App.4th 327, 353-54 (2008) (noting that the temporal proximity evidence established in a *prima facie* may still have relevance in the pretext phase).

Second, the timing of Scalzitti's investigation of Mitri is significant.  There were at least two months, the end of October to the end of December, where Scalzitti apparently did not look into Mitri's time keeping.[14]  If Walgreens was indeed concerned with the overtime that Mitri was keeping, it would seem that Mitri's time schedules would have been reviewed prior to the

---

[14] Indeed, Walgreens has presented no evidence regarding how often, if ever, it checked Mitri's time records after issuing the Final Written Warning.

December 26 e-mail.  Instead, Scalzitti began investigating Mitri only after the December 26 e-mail.[15]  See PUMF 23.  Similarly, it is unclear whether there was coordination with Loss Prevention, even though Scalzitti's December 28 e-mail to Mitri indicated that there would be such coordination.[16]  See Mitri Depo. Ex. 36; Warinner Depo. 75:25-76:11.  Instead of following up on billing/Medicare fraud or speaking to Mitri about the fraud or doing another "sweep" as he had done in June, it appears that Scalzitti contacted Murray, reviewed Mitri's time records, and then e-mailed Murray concerning Mitri potentially violating the terms of the Final Written Warning.  In other words, the evidence suggests that instead of investigating possible fraud, Scalzitti investigated possible avenues of terminating Mitri.

Third, when Mitri met with Warinner on December 30, he was told that it was not his job to report fraud to the government.  See Mitri Dec. ¶ 6.  This suggests hostility to whistleblowing.

Fourth, the failure of a company to follow its own policies may show pretext or an improper motive.  See Porter v. California Dept. of Corrections, 419 F.3d 885, 896 (9th Cir. 2005); see also Trustees of Cal. State Univ. v. Public Emp't Relations Bd., 6 Cal.App.4th 1107, 1124 (1992).  There is no dispute that Mitri's conduct did not justify immediate termination.  See PUMF 98.  However, contrary to Walgreens's progressive disciplinary system, it does not appear that Mitri was given a formal verbal warning or a formal written warning about clocking in early/staying late prior to the Final Written Warning.[17]  See PUMF 101; Scalzitti Dep. Ex. 51.  It

---

[15]It is true that Scalzitti declared that he reviewed Mitri's time records as part of his regular course of business.  See Scalzitti Dec. ¶ 4.  However, considering the timing of the investigation and the other evidence presented, a jury will have to assess the evidence and make its own determination regarding the investigation of Mitri's time keeping.

[16]However, there is no dispute that Mitri did in fact meet with Warinner on December 30, 2009.

[17]Walgreens states that a prior manager asked Mitri to do a better job about sticking to his schedule.  See DRPUMF 101; PUMF 103.  As discussed above, however, there is no evidence that this constituted a formal verbal warning, and it certainly does not constitute a formal written warning.  Walgreens also contends that, in the Release, Mitri agreed that, "in the future he will work at times when he has been scheduled to work and has clocked in."  PUMF 118 (emphasis added).  However, the Release dealt with working off the clock.  The cited portion of the Release does not deal with clocking in prior to schedule or staying clocked in late.  There is no evidence that the Release was intended to address clocking in prior to schedule or staying late.  Finally, Walgreens states that Guillen spoke to Mitri on several occasions about the importance of adhering to the scheduled shifts.  See DUMF 8.  However, there is no evidence regarding what Guillen said, the context of the statements, or whether Guillen's statements were intended to be formal verbal warnings.  Further, Scalzitti stated that discipline was to be documented, see Scalzitti Depo. 40:20-25, yet there is no documentation provided that Guillen disciplined Mitri through a verbal warning.

is true that the progressive disciplinary system is not a contract of employment with employees. Nevertheless, the system is part of a formal written Walgreens policy, and that policy states that the progressive system should be used when immediate termination is not justified. See Scalzitti Depo. Ex. 51. Instead of following the intermediate steps with Mitri, Walgreens bypassed steps and went directly to a final written warning. Further, the Final Written Warning was issued less than one month after Mitri's first complaint about IOU labels in April 2009. The timing of the Final Written Warning in relation to Mitri's complaints, the apparent failure of Walgreens to follow its progressive disciplinary policy, and the use of the Final Written Warning to justify Mitri's termination (again after Mitri made complaints concerning IOU labels) is significant.

Fifth, it appears that Walgreens largely relied on the January 6 e-mail from Scalzitti to terminate Mitri's employment. However, accepting Mitri's allegations as true, none of the instances included in the January 6 e-mail reflect violations of the Final Written Warning. Fully half of the documented occurrences come within the 10 to 15 minute window that Scalzitti expressly gave to Mitri in which to clock in early. See DRPUMF 150; Mitri Depo. 125:22-126:10. Scalzitti also included instances in which Olivares requested that Mitri come in early or in which Olivares had approved Mitri working beyond schedule. See PUMF's 151, 153; Scalzitti Dec. Ex. A; Mitri Depo. 218:10-219:6. Moreover, in those instances where Mitri clocked out late, Mitri testified that he told either the store manager or the assistant store manager who was acting in the store manager's stead that he had stayed late to help a customer.[18] See Mitri Depo. 147:3-9; Mitri Dec. ¶ 3. This would appear to be in compliance with what Walgreens told Mitri to do. See DUMF 16; PUMF 131; Mitri Depo. 125:22-126:10. It is true that simply showing that the factual basis for termination is erroneous does not necessarily show pretext. See Diaz v. Eagle Produce, Ltd., 521 F.3d 1201, 1214 n.7 (9th Cir. 2008); Guz, 24 Cal.4th at 358; Arteaga, 163 Cal.App.4th 327 at 344. However, considering what Scalzitti included in the e-mail and what he and other Walgreens officers had told Mitri, the nature and accuracy of the January 6 e-

---

[18]Walgreens argues that Mitri was never told that he could tell an assistant manager. However, Walgreens has presented no evidence that telling the assistant manager when the store manager was unavailable was improper. In fact, telling the assistant manager when the store manager is absent seems to be a logical and natural thing to do.

1 | mail is significant.  See Guz, 24 Cal.4th at 356.

2 |        Sixth, it has been recognized that an "employer's failure to interview witnesses for

3 | potentially exculpatory information evidences pretext."  Nazir v. United Airlines, Inc., 178

4 | Cal.App.4th 243, 280 (2009).  Here, Mitri was never questioned or asked to give an explanation

5 | for the occurrences identified by Scalzitti in the January 6 e-mail.  When Mitri was suspended on

6 | January 6, he was told that he was under investigation (though not for what) and that he was to

7 | talk to no one from Walgreens until after Scalzitti and/or Guillen spoke with him.  See Mitri

8 | Depo. 235:16-236:1.  However, there is no indication that anyone from Walgreens undertook any

9 | effort to question Mitri about the instances of clocking in early or staying late.  Instead, the

10 | decision to terminate was reached on January 5 or 6, a statement was obtained from Olivares on

11 | January 8, Mitri was terminated on January 8, and Mitri was prevented from answering the

12 | claims against him when he was terminated.  See PUMF's 8, 18, 164; Scalzitti Dec. Ex. B.  If

13 | Mitri had been interviewed to obtain his side of the story, such an interview would have led to

14 | his explanations regarding what he was told by Scalzitti about clocking in 10 to 15 minutes early,

15 | would have led to specific instances in which approval by Olivares was obtained, would have led

16 | to a determination regarding what exactly Mitri had been told from the various Walgreens

17 | officers about obtaining approval and/or staying late, and would have likely led to the interview

18 | of the assistant store manager(s).  The evidence presented suggests that interviewing Mitri more

19 | likely than not would have led to the discovery of exculpatory information.[19]  Under the totality

20 | of the circumstances of this case, the failure to interview Mitri is significant.[20]

21 |        Walgreens argues in part that its conduct towards others who have reported fraud, as well

22 | as its discipline of other employees, indicates that it did not retaliate against Mitri.  However, the

23 | evidence is insufficient to undermine Mitri's evidence.  Walgreens's evidence indicates that

24 |

25 | [19]The Court is by no means holding that an employer is always required to interview an employee prior to disciplining or terminating that employee.  Nor is the Court holding that an employer must follow "best practices" in

26 | its human resources decisions.  Nevertheless, given the unique facts and circumstances of this particular case, the Court believes that the failure to interview Mitri/get Mitri's side of the story is significant.

27 | [20]As outlined above, Mitri makes other arguments regarding pretext.  However, since the evidence that the

28 | Court has expressly discussed is sufficient to establish pretext, it is unnecessary to address Mitri's additional arguments at this time.

Walgreens disciplined seven employees in 2010 (including Mitri) for working beyond shift.  See DUMF 33.  However, there are no further facts or details provided regarding these instances of discipline.  As such, there is no way for the Court to determine whether these instances are similar to Mitri's particular situation, including whether the disciplined employees had been told similar things as Mitri about clocking in early and staying late.  Walgreens's evidence also indicates that Walgreens investigated two reports of improper billing practices, determined the complaints were founded, and did not discipline the reporting employees.  See DUMF 35.  However, there is no evidence regarding the nature of the billing complaints.  Finally, Walgreens's evidence indicates that in 2010, Walgreens terminated seven other employees for violating the terms of a Final Written Warning.  However, there is no evidence concerning the nature of these warnings or these terminations.  Again, there is no way for the Court to determine whether these instances are similar to Mitri's particular situation.

In sum, viewing the evidence in the light most favorable to Mitri as the non-moving party, the totality of the evidence is sufficient to create a genuine issue of disputed material fact as to whether Walgreens's reason for the termination was pretext.

**CONCLUSION**

Walgreens has two bases for moving for summary judgment on Mitri's sole cause of action for wrongful discharge in violation of public policy.

With respect to Walgreens's contention that Mitri cannot establish a *prima facie* case, the evidence is to the contrary.  The evidence establishes that Walgreens had knowledge of Mitri's complaints about Medicare/billing fraud through use of IOU labels.  Further, Mitri was terminated less then two weeks after he again raised the problem of IOU labels.  This evidence provides a sufficient causal connection.  Therefore, summary judgment on this basis is inappropriate.

With respect to Walgreens's contention that Mitri cannot show pretext, the Court cannot agree.  As discussed above, the timing of Mitri's complaints relative to his termination, being told that it is not his job to report fraud to the government, the apparent failure of Walgreens to

follow its progressive disciplinary system, the timing of the Final Written Warning, the failure of Walgreens to interview Mitri, the timing of Scalzitti's investigation of Mitri, and the inaccuracy of January 6 e-mail in light of the various things told to Mitri about clocking in early/staying late together constitute substantial evidence of pretext.  That is, the evidence tends to undermine whether Walgreens actually terminated Mitri for violating the terms of the Final Written Warning.  A reasonable trier of fact could consider this evidence and find that Walgreens's non-retaliatory reason is not true, and that the termination was the result of retaliatory animus.  Therefore, summary judgment on this basis is inappropriate.


Accordingly, IT IS HEREBY ORDERED that Walgreens's motion for summary judgment is DENIED.


IT IS SO ORDERED.

Dated:    June 3, 2011       _____

CHIEF UNITED STATES DISTRICT JUDGE