1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT FOR THE

9                  EASTERN DISTRICT OF CALIFORNIA

10

11   **SAMI MITRI,**                          )   **1:10-cv-538  AWI SKO**
                                              )
12                  **Plaintiff,**            )
                                              )
13          v.                                )   **ORDER ON PLAINTIFF'S**
                                              )   **MOTION FOR NEW TRIAL**
     **WALGREEN CO., INC. dba**               )   **AND DEFENDANT'S MOTION**
14   **WALGREENS, and DOES 1 to 20,**         )   **RENEWED MOTION FOR**
     **inclusive,**                           )   **JUDGMENT AS A MATTER**
15                                            )   **OF LAW**
                    **Defendants.**           )
16   _____  )   (Doc. Nos. 102, 105)

17

18        Plaintiff Sami Mitri ("Mitri") alleged one cause of action against his former employer

19   Defendant Walgreen Company, Inc. ("Walgreens") for state law wrongful termination in

20   violation of public policy.  A jury trial was held in August 2011.  The jury returned a verdict in

21   favor of Mitri.  The jury awarded $88,000 in economic damages, $0 in non-economic damages,

22   and $1.155 million in punitive damages.  Pursuant to Rule 50(b), Walgreens now renews its

23   request for judgment as a matter of law on the issues of liability and punitive damages.  Pursuant

24   to Rule 59(a), Mitri now moves for a new trial on the limited issue of non-economic damages.

25   For the reasons that follow, Walgreens's motion will be denied as to liability, but granted as to

26   punitive damages, and Mitri's motion will be denied.

27

28

# I.      DEFENDANT'S MOTION

### *Defendant's Argument*

Walgreens argues that there is no legally sufficient evidence that supports liability. Scalzitti, Guillen, Murray, and Hasty testified without contradiction that they terminated Mitri for failing to follow a final written warning.  Mitri did not establish that he had actually received permission to work beyond schedule on the dates identified on Scalzitti's list.  Mitri also failed to establish the existence of any scheme by Scalzitti.  Further, Mitri's "timing argument' is not persuasive because he was not subject to discipline when he complained about billing practices in June and October 2009.  Further, two other employees were treated similarly to Mitri for working beyond schedule, and they had not complained about billing issues.  Finally, other employees, like Lisa Warriner, raised concerns about "old fashioned IOU's" yet suffered no retaliation.  The evidence presented at trial could lead to only one reasonable conclusion, and that is that Mitri's complaints were not a motivating reason for his termination.

Walgreens also argues that there is legally insufficient evidence to support the imposition of punitive damages.  Walgreens contends *inter alia* that there is not clear and convincing evidence that Robert Hasty was a managing agent.  Hasty testified that he has no authority to make formal policies that affect a substantial portion of Walgreens, and only 253 of Walgreens's 7,742 stores come within Hasty's authority.  Punitive damages are only available against a corporate defendant for the actions of a corporate officer, director, or managing agent.  Since the evidence failed to establish that Hasty was a managing agent, punitive damages are unavailable as a matter of law.

### *Plaintiff's Opposition*

Mitri argues that there is sufficient evidence to support the jury's finding on the liability and punitive damages issues.  With respect to liability, Mitri argues that Walgreens has inverted the standard for a Rule 50 motion and seeks the benefits of presumptions that rightfully belong to him.  Further, several pieces of evidence support the conclusion that Walgreens unlawfully retaliated.  Walgreens knew about the complaints of fraudulent billing, and shortly following the complaints, investigation and/or retaliatory conduct occurred.  The evidence indicated that

Scalzitti focused solely on Mitri, despite the *de minimus* periods of working "beyond shift," and in the absence any corroborating evidence that Mitri's store had gone over budget.  Further, despite new complaints of billing fraud involving Scalzitti, Walgreens did not investigate or discipline Scalzitti, even though Walgreens's policies required such investigation.  Further, Hasty, Guillen, Murray, and Scalzitti contradicted each other in numerous areas.  Further, the investigation was done without obtaining any information from Mitri.  Finally, Warinner told Mitri that it was not his job to report fraudulent billing to government agencies.  Such evidence demonstrate a discriminatory/retaliatory motive.

With respect to punitive damages, Mitri argues *inter alia* that Hasty had extensive experience with Walgreens, and was one of twenty-nine market vice presidents.  This position put Hasty four levels down from the head of Walgreens, and gave Hasty the ability to ultimately determine who would be a store manager in his region.  Hasty's region included either all or portions of five states.  As indicated by Murray, managers in the field had final authority to make employment decisions.  Hasty described his duties in broad and vague terms, yet he had the clout to contact upper level employees in the compliance department about Mitri's complaints.  It was after Hasty contacted compliance that the decision was made to send the pharmacists in Guillen's district to retraining.  Hasty did not get instruction on every aspect of his job from his superiors, and could be involved in the selection of pharmacy managers "if he liked."  Hasty also supervised and evaluated Guillen, and Guillen was Scalzitti's supervisor, and Scalzitti was Mitri's supervisor.  Further, Hasty gave instructions to Mitri about how to comply with the final written warning, as if he had the authority to clarify or correct the instructions.  Hasty also acknowledged that he was involved in the terminating conversations and approved of Mitri's termination.  Additionally, despite corporate policy to the contrary, Hasty exercised his discretion by not initiating an investigation of Guillen or Scalzitti in 2009 when Mitri complained about Scalzitti.  Thus, the testimony indicates that Hasty defined his own job duties, he could choose whether to be involved in employee discipline matters, and could give interpretations of final written warnings in the absence of subordinates.  Hasty created a new corporate policy by allowing Guillen and Scalzitti to require Mitri to call before staying late.  Despite this, there was

1  no evidence presented by Walgreens that Hasty's discretion was in any way limited.  See
2  Opposition at 24-27.

3       *Legal Standards*

4       1.       Rule 50(b)

5            After a jury has returned a verdict, Rule 50(b) permits a party to renew its prior Rule
6  50(a) motion for judgment as a matter of law.  See Fed. R. Civ. P. 50(b); EEOC v. Go Daddy
7  Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009); Freund v. Nycomed Amersham, 347 F.3d 752,
8  761 (9th Cir. 2003).  "A renewed motion for judgment as a matter of law is properly granted if
9  the evidence, construed in the light most favorable to the nonmoving party, permits only one
10 reasonable conclusion, and that conclusion is contrary to the jury's verdict."  Harper v. City of
11 L.A., 533 F.3d 1010, 1021 (9th Cir. 2008); see Winarto v. Toshiba Am. Elecs. Components, Inc.,
12 274 F.3d 1276, 1283 (9th Cir. 2001).  When considering a motion to set aside a jury verdict, the
13 court should review all of the evidence in the record in the light most favorable to the non-
14 moving party, and must draw all reasonable inferences in favor of the nonmoving party.  Reeves
15 v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000); see Harper, 533 F.3d at 1021.
16 However, "a reasonable inference cannot be supported by only threadbare conclusory statements
17 instead of significant probative evidence," nor may a jury's conclusion be based on mere
18 speculation.  Lakeside-Scott v. Multnomah County, 556 F.3d 797, 802-03 (9th Cir. 2009).  The
19 court "may not make credibility determinations or weigh the evidence" and "must disregard all
20 evidence favorable to the moving party that the jury is not required to believe."  Reeves, 530 U.S.
21 at 150-51; see Harper, 533 F.3d at 1021.  "The court must accept the jury's credibility findings
22 consistent with the verdict . . . [and] may not substitute its view of the evidence for that of the
23 jury."  Winarto, 274 F.3d at 1283.  "A jury's verdict must be upheld if it is supported by
24 substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is
25 also possible to draw a contrary conclusion."  Harper, 533 F.3d at 1021.  Finally, because a Rule
26 50(b) motion is a renewed motion, "a party cannot properly raise arguments in its post-trial
27 motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict
28 Rule 50(a) motion."  Go Daddy, 581 F.3d at 961; Freund, 347 F.3d at 761.

2.      California Civil Code § 3294 – Punitive Damages

In non-contract cases, California law provides that a plaintiff may seek punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).  A corporate employer may not be held liable for punitive damages arising from the acts of an employee unless "an officer, director, or managing agent of the corporation . . . had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Id. at § 3294(b).  Managing agents are "those corporate employees who exercise substantial independent authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy." White v. Ultramar, Inc., 21 Cal.4th 563, 566-67 (1999).  These are corporate policies that "affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." Roby v. McKesson Corp., 47 Cal.4th 686, 714 (2009).  "Corporate policies" are generally viewed as the "general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations." Cruz v. Homebase, 83 Cal.App.4th 160, 167 (2000).  Whether "a supervisor is a managing agent within the meaning of Civil Code section 3294 does not necessarily hinge on their level in the corporate hierarchy." Muniz v. UPS, 731 F.Supp.2d 961, 976 (N.D. Cal. 2010); Myers v. Trendwest Resorts, Inc., 148 Cal.App.4th 1403, 1437 (2007); see White, 21 Cal.4th at 576-77.  "Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." Muniz, 731 F.Supp.2d at 977; Myers, 148 Cal.App.4th at 1437.  A plaintiff must demonstrate that an alleged managing agent exercises "substantial discretionary authority over significant aspects of a corporation's business." White, 21 Cal.4th at 577.  Whether employees exercise sufficient authority is determined on a case-by-case basis. White, 21 Cal. 4th at 567.  Finally, each requirement of Civil Code § 3294(b) must be established by "clear and convincing evidence," including an employee's status as a managing agent. Barton v. Alexander Hamilton Life Ins. Co. of Am., 110 Cal.App.4th 1640, 1643-44 (2003).  "Clear and convincing evidence" is a higher

evidentiary standard than "preponderance of the evidence."  See Johnson & Johnson v. Superior Court, 192 Cal.App.4th 757, 762 (2011); People v. First Fed. Credit Corp., 104 Cal.App.4th 721, 732 (2002).  To meet this standard, the evidence must indicate that something is "highly probable."  See In re Agnelia P., 28 Cal.3d 908, 919 (1983).  That is, the evidence must be "so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind."  Id.; Scott v. Phoenix Schools, Inc., 175 Cal.App.4th 702, 715 (2009).

*Discussion*

A.      Liability

The Court is not persuaded by Walgreens's arguments.  There is circumstantial evidence that supports the jury's verdict on liability.  For example, the timing of the discipline and termination, the failure to follow the progressive disciplinary system as written, the inclusion on Scalzitti's list of instances of working beyond schedule that were actually approved, the nature of the investigation against Mitri (including the failure to obtain his version), Mitri's complaints about Scalzitti, the failure of Scalzitti or Guillen to tell Oliveras (Mitri's store manager) about Mitri's need to obtain permission to stay "beyond schedule," and Mitri being told by Warriner that it was not his job to report fraud to the government, are all supportive of a liability finding.  This evidence is significant, and is not "threadbare" or unduly speculative.  Cf. Lakeside-Scott, 556 F.3d at 802-03.  Further, Mitri argued that Walgreens's explanation for the termination was not believable partly because the amount of time that Mitri worked beyond schedule was *de minimis*, especially in light of the profits that Mitri generated on behalf of Walgreens.  This is not an unreasonable view of the evidence.

The Court recognizes that Walgreens's position with respect to the above evidence is contrary to Mitri's position.  However, not all of Walgreens's interpretations and positions are fully supported.  Moreover, the jury was not required to believe any particular aspect of the defense theories or the defense evidence, including the express denials of wrong doing by Scalzitti, Guillen, Murray, and Hasty.[1]  Cf. Guy v. City of San Diego, 608 F.3d 582, 588 (9th Cir.

---

[1] Along this same vein, the demeanor of several of the defense witnesses on the witness stand were not helpful to their own credibility or to Walgreens's position.

2010).  What Walgreens is doing is highlighting positions or evidence that it believes supports its

theories, and, in essence, requests that its positions be believed and that all inferences be made in

its favor.  That is not the proper standard, and the Court will not weigh the strength of

Walgreens's interpretation of the evidence.  See Reeves, 530 U.S. at 150-51; Harper, 533 F.3d at

1021.  Viewing the evidence in the light most favorable to Mitri, and making all reasonable

inferences in his favor, there was sufficient evidence to support the jury's finding of liability.

Reeves, 530 U.S. at 150-51; see Harper, 533 F.3d at 1021.  Because the evidence does not clearly

support only one reasonable conclusion, Walgreens's Rule 50(b) motion as to liability will be

denied.  See Harper, 533 F.3d at 1021.

B.      Punitive Damages

In imposing punitive damages upon Walgreens, the jury determined that Robert Hasty

was a managing agent.[2]  The evidence presented to the jury regarding Hasty was his entire

deposition and then live testimony during Walgreens's case in chief.

In relevant part, Hasty's deposition indicated that: (1) he is currently one of twenty-nine

Market Vice Presidents; (2) his jurisdiction includes all of Utah and Idaho, central California

from Redding to Visalia, Las Vegas, Nevada, and four stores in northwest Arizona; (3) he is not

a director or officer of Walgreens; (4) he was previously an Operations Vice President; (5) he has

worked for Walgreens for approximately 34 years; (6) he met with Mitri following Mitri's final

written warning and gave Mitri guidance on how to behave in light of the final written warning;

and (7) he participated in telephone conversations and collaborated in, and approved of/agreed to,

the termination of Mitri.  See Court's Docket Doc. No. 105-2.

Hasty's trial testimony contained the same information listed above.  See id. at Doc. No.

105-3.  In addition, Hasty explained that he is four levels down from the ultimate head of

Walgreens.[3]  See id. at 17:15-17.  Hasty testified that he does not have the discretion to make

decisions that ultimately determine corporate policy, he does not have the discretion to establish

---

[2]Neither party contends that Hasty was an officer or director.

[3]Hasty testified during trial that five corporate operation vice presidents were over twenty-nine market vice presidents.  See Court's Docket Doc. No. 105-3 at 16:22-17:8.  The five corporate operation vice presidents report to the president of community operations, who in turn reports to the president of Walgreens.  See id. at 17:9-14.

formal policies that are used company-wide, and he does not have the discretion to make formal policies that affect a substantial portion of Walgreens.  See id. at 5:8-6:1.  When asked to describe his job duties, Hasty testified: "My duties include focusing on improving sales, bottom-line profit, improve market share, and coaching and mentoring DM's[4] and store manager support."  Id. at 4:20-24.  Hasty testified that, "from time to time," he makes decisions without consulting his superiors.  Id. at 18:16-21.  As examples of the kinds of things he does without consulting his superiors, Hasty responded: "Day-to-day business activities, where I'm going to go, which market I'm going to work in, which district manager I'm working with, that kind of thing."  Id. 19:1-7.  Hasty explained that he mentored district managers in "day-to-day activities in their job and how they're performing and what I can do to help them improve."  Id. at 19:16-23.  Hasty testified that he is not involved in selecting district managers, he can be involved in selecting pharmacy managers but has not done so recently,[5] and he is the person who will ultimately determine who will be a store manager after his district managers bring names forward to him.  See id. at 20:3-25.  Hasty testified that he has no involvement in disciplining pharmacists.  See id. at 21:2-8.  Hasty confirmed that he is Robert Guillen's (who was Mitri's district manager) direct supervisor and that he does Guillen's performance reviews.  See id. at 35:16-19.  Additionally, Chris Murray testified that it was his understanding that Hasty had the ability to terminate employees within his (Hasty's) region.  Finally, Hasty testified that if he became aware of a supervisor pressuring an employee to engage in fraudulent billing, then Walgreens's policies required that he contact employee relations and an investigation would be opened.  See id. at 27:1-8.

To the Court's understanding, the above evidence is all the evidence that relates to Hasty's job duties, and is all that the parties have specifically cited to the Court on the issue of Hasty's job duties.  Viewing this evidence in the light most favorable to Mitri, the Court cannot find that the above recited evidence is sufficient to show, by clear and convincing evidence, that

---

[4] A "DM" appears to mean a "district manager."  Cf. Court's Docket Doc. No. 105-3 at 19:1-23.

[5] Hasty explained that the district managers and pharmacy supervisors select the pharmacy managers.  See Court's Docket Doc. No. 105-3 at 21:1-12.

Hasty is a "managing agent" of Walgreens.

It is true that Hasty is one of twenty-nine "market vice presidents," and this position is fourth from the top in Walgreens's corporate hierarchy. However, even though Hasty's title includes the term "vice president," an employee's job title does not necessarily determine an employee's status as a managing agent. See White, 21 Cal.4th at 566-67, 576-77; Myers, 148 Cal.App.4th at 1437. Hasty's title allows him to hire store managers and to be involved in the hiring of pharmacy managers if he chooses. Hasty also has the ability to terminate employees within his region. However, the mere ability to hire and fire does not turn an employee into a managing agent. See White, 21 Cal.4th at 566-67. Hasty's title also allows him to mentor district managers, but it does not give him the authority to hire the district managers whom he mentors. The district managers are hired instead by the five corporate operations vice presidents who are over Hasty.[6] The inability to hire district managers, who are under Hasty in the corporate hierarchy, indicates that Hasty's position does not give him complete authority within his "jurisdiction" or region.

The critical inquiry in determining if an employee is a managing agent is whether that employee has the ability to determine corporate policy for a substantial portion of the corporation. See Roby, 47 Cal. 4th at 714; White, 21 Cal.4th at 576; Myers, 148 Cal.App.4th at 1437. Hasty indicated that his duties focused generally on mentoring and what may be termed in shorthand as "profitability." It is unknown exactly how Hasty focused on profitability and mentoring within his region. When asked to describe the activities that he does without consulting his superiors, Hasty did not give examples that indicated an ability to set policies within his jurisdiction. Instead, the examples were more along the lines of which particular district or district manager he would visit or review that day. Further, Hasty's response to the hypothetical question about a supervisor who required improper billing practices indicated that Hasty was to follow Walgreens policy and contact employee relations. Hasty's response did not

---

[6]Hasty testified that before he was a Market Vice President, he was an Operations Vice President. He also testified that Operations Vice Presidents are over Market Vice Presidents. Thus, the evidence indicates that Hasty was in some way demoted to his current position. A demotion suggests more limited job functions.

indicate that he determined policy.[7]  Finally, there was no testimony or evidence that Hasty

actually had the ability to originate new practices that were to be followed within his region.

That is, there was no evidence that Hasty's decisions ultimately set the general principles which

guide the corporation, or set the rules intended to be followed consistently over time in corporate

operations.  See White, 21 Cal.4th at 566-67; Cruz, 83 Cal.App.4th at 187.  To the contrary,

Hasty testified without contradiction that he had neither the ability to set company wide policies,

nor the ability to set policies that affected a substantial portion of Walgreens.  Thus, there is no

evidence (either to the Court's knowledge or that has been cited by the parties) that shows Hasty

had the ability to set or determine any policies, whether they affected a substantial portion of

Walgreens or not.[8]

Mitri had the burden of establishing by clear and convincing evidence that Hasty was a

managing agent of Walgreens.  See Barton, 110 Cal.App.4th at 1643-44.  The evidence presented

does not do so because it does not sufficiently address or establish Hasty's ability to actually set

corporate policy.  See Muniz, 731 F.Supp.2d at 976-77; Gelfo v. Lockheed Martin Corp., 140

Cal.App.4th 34, 63 (2006); Barton, 110 Cal.App.4th at 1643-44; Cruz, 83 Cal.App.4th at 167-68;

Kelly-Zurian v. Wohl Shoe Co., 22 Cal.App.4th 397, 421-22 (1994).  The evidence does not

reasonably support the conclusion that Hasty was a "managing agent" as defined by White and

Roby, and the jury's contrary finding is too speculative.  See Lakeside-Scott, 556 F.3d at 802-03.

Therefore, judgment in favor of Walgreens on the issue of punitive damages is appropriate.

---

[7]Mitri's related argument regarding retraining after Hasty contacted Walgreens's compliance department is
not persuasive.  When Mitri's first billing fraud complaints were substantiated, Walgreens required additional
training for its pharmacists.  However, no evidence has been cited that shows that Hasty originated the retraining or
determined that the retraining would occur.  In fact, Hasty's testimony indicated that it was the compliance
department that ordered the pharmacists to be retrained.  See Doc. No. 105-3 at 7:11-8:2.  Further, Hasty's
deposition indicated that he was not a part of the investigation into Mitri's complaints, he never gave input into the
investigation, and he was not given the investigation's results.  See Doc. No. 105-2 at 18:12-19:10.  If Hasty were
never involved in the investigation or given the results, then there is no reason to conclude that he had anything to do
with the decision to order retraining.

[8]Mitri's argument that Hasty established the new corporate policy of Mitri calling before staying late is not
persuasive.  That condition was unique to Mitri and appears to have been ad hoc in nature.  There is nothing to
indicate that the rule was meant to guide general corporate operations over a prolonged period of time.  See Cruz, 83
Cal.App.4th at 187.  Moreover, it appears that the rule was created by Scalzitti and Guillen, and not by Hasty.

## II.      PLAINTIFF'S MOTION

### *Plaintiff's Motion*

Mitri argues that the jury's zero dollar award for non-economic damages is inadequate, is against the great weight of the evidence, and is a miscarriage of justice.  Mitri testified to the shock, humiliation, and anguish of being terminated (including discussions with his family about his termination), the anxiety of finding new work, the disappointment of the nature of his new work, and the continued mental distress he suffers.  Walgreens never rebutted any of Mitri's testimony regarding emotional distress.  In fact, during closing argument, Walgreens conceded that Mitri suffered emotional distress when counsel stated that Mitri was "upset" about losing his job and that he should be "upset."  Walgreens then mitigated the severity of Mitri's emotional distress by arguing that Mitri had not seen a doctor or been involuntarily committed.  However, Mitri was not required to seek psychiatric counseling, nor was he required to show "severe emotional distress."  Employment is so associated with one's well being that it is obvious that such an occurrence would cause emotional distress, and the zero dollar award for non-economic damages is improper.

### *Defendant's Opposition*

Walgreens argues that Mitri has waived his right to bring a Rule 59 motion on the issue of damages because he failed to make an objection prior to the discharge of the jury.  It is well established that a litigant waives any argument that a jury's damages award is inconsistent with a finding of liability if an objection is not made prior to the discharge of the jury.

If the Court excuses Mitri's waiver, a new trial is not warranted because Mitri's position is not supported by law, the jury instructions, or the evidence.  Cases have found that a jury's decisions to find liability, yet award no damages, does not itself render a verdict invalid.  Further, the jury instructions provide for the possibility of no emotional distress damages.  The instructions tell the jury that it is for them to determine "what damages, *if any*, have been proved," and "If you choose to award emotional distress damages . . . ."  Finally, Mitri's only evidence regarding emotional distress was his own self-serving testimony; he offered no other witnesses or evidence.  Cross-examination determined that Mitri missed no work, sought no

medical or psychological treatment, and nothing prevented him from holding full-time employment.  The jury heard Mitri's testimony and rejected it.  A jury may refuse to credit even uncontradicted testimony.  As such, the verdict was not against the great weight of the evidence.

*Legal Standard*

Rule 59(a) reads in part: "The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "Historically recognized grounds [for new trial] include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  The Ninth Circuit has held that a trial judge may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir.1999); Roy v. Volkswagen of America, Inc., 896 F.2d 1174, 1176 (9th Cir.1990); see also Molski, 481 F.3d at 729.  In considering a motion for a new trial, the trial court may assess the credibility of the witnesses and weigh the evidence.  See Kode v. Carlson, 596 F.3d 608, 612 (9th Cir. 2010); Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987).  In fact, the trial court has a duty to weigh the evidence.  See Molski, 481 F.3d at 729.  The court need not view the evidence in the light most favorable to the prevailing party.  See Landes, 833 F.2d at 1372.

With respect to motions based on the "clear weight of the evidence," the Ninth Circuit has explained that, after weighing the evidence, the trial judge faces "a difficult task":

> It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence].  Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case.  On the one hand, the trial judge does not sit to approve miscarriages of justice.  His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it.  On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should

accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. *If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.*

Landes, 833 F.2d at 1371-72 (emphasis added).  Thus, "[d]oubts about the correctness of the verdict are not sufficient grounds for a new trial:  the trial court must have a firm conviction that the jury has made a mistake."  Id. at 1372; see also 4.0 Acres, 175 F.3d at 1139 (". . . a district court may not grant or deny a new trial merely because it would have arrived at a different verdict.").

*Pertinent Trial Testimony & Argument*

1.      Mitri's Testimony

On August 4, 2011, Mitri gave direct testimony that related to non-economic damages. With respect to the day he was terminated, Mitri testified:

> So I said Chris [Scalzitti], do you mind if I interrupt you and he raised his voice and said, "Yes.  Actually I do mind.  I wanted - - I just want to get this over with."  And at that point, my heart sank, and I knew what they were going to do.  He continued to talk about - - he didn't give me any examples of violations.  He said a few things. . . . it didn't last long.  Five minutes or so.  And at the end, he had a manila envelope with some papers in it.  He pulled out a piece of paper.  He said this is your final check.  He explained that they were terminating me. . . . He explained the details of the paycheck, how it included on 18th of my vacation pay that I had accrued over the one week that I had worked that year.  And said you're terminated from Walgreens.  You can go.

When asked whether Scalzitti or Guillen ever asked for Mitri's side of the story, Mitri replied:

> No.  I tried.  I tried.  I tried to give them examples or have them give me examples of what they thought was improper or what they thought was a violation of their policies or procedures, severe enough for me to get terminated.  I think I - - no, I know, I - - during that meeting.  I let them know.  I even asked Mr. Olivares, you know, and he approved several times for me to come in early.  I told him that statement.  And Chris's response to that was, we spoke to Mr. Olivares, and his exact words were, "under threat of termination, if he lied, Mr. Olivares told us that he never on any occasion approved you to ever come in early or stay late.  And again, when I heard that statement, I knew that they had already made up their decision because I knew that was not a true statement.  Mr. Olivares had approved me.  He actually asked me to stay or to come in early.  And at several occasions.  I want to say many occasions.  But they didn't want to hear any of that.  He just pulled out my check and said you're free to go.

Mitri was then asked about whether the termination was still affecting him, and Mitri

replied "every single day."  When asked to explain why or what about the termination still affects

him, Mitri responded:

> I stood up and I shook his hand, and then I shook Mr. Guillen's hand and I said thank you.  And I left the office.  I don't know how I drove home.  But I ended up driving home, entering my house, walking through a hallway.  My wife and my mother were there.  They knew why I was going to this meeting.  They didn't know what the result of the meeting was going to be.  I walked in and I first saw my wife sitting in the chair.  And I walked in further, and I saw my mother sitting on the couch.  My wife asked me so how did it go, and she could tell by the look on my face.  And I told her.  I said they fired me and then, two seconds after I said that, my 9 year old son at that time out loud said, Daddy got fired by Walgreens?  Walgreens fired Daddy?  I didn't know he was in the room.  I said - - I said no son, it's okay.  No, nothing happened.  I didn't want him to hear that.  I didn't want him to think of me any less of a person.  Any less of a father.  I didn't do anything wrong.

> When he was able to talk, the first words out of his mouth were every time we drove by a Walgreens, Daddy's Walgreens.  He knew my connection to Walgreens.  He knew how much time I had spent at Walgreens and how much I had given to them.  And for him to hear that, it was just humiliating.  I'm sorry.  You asked me a question.  I'm sorry.

When asked whether he had feelings of panic since the day of his termination, Mitri

explained:

> Yes.  Every - - every day.  Every day.  Before I go to bed, it's what keeps me up at night.  It's what prevents me from falling asleep.  The first thing in the morning.  2:00, 3:00 in the morning sometimes.  It's what wakes me up with a nightmare in the middle of the night.  Every single night.  Every single night.  I can't think of a single night that I don't think about that day.  In fact, about that whole time since the final written warning.  But mainly since that day and hearing my son and having him be there and seeing my mother there in tears after I told her and the look on my wife's face of - - not so much despair, just sympathy for me.  I didn't want them to feel sorry for me.  I was very, very proud.  I had a lot of dignity.  I was - - as high as you could be with Walgreens.  Everybody had always told me, you know, you're the best Walgreens pharmacist ever.  And after 14 years for them to just let me go, for what they claimed were clocking in a few minutes early or clocking out a few minutes late, which everybody knew every pharmacist did, for them to do that to me, when I knew that what the real reason was.  I knew what the real reason was.  For them to do that destroyed me.  I wish there was a better word, but it destroyed me.  It put me into a deep, deep depression.  I was disengaged from my family.  I was never happy again.  I don't remember laughing or smiling.  I felt like - - I felt like I had died.  Walgreens was my family.  I had spent so much time there and had so many friends and coworkers and employees and especially the last store that I worked at, at First and Bullard . . . I felt like I had died.  And I really, really, really did want to die.  I wanted to die at that moment.  I felt so bad.

> (Pause in proceedings) I thought I would be over it by now, but every day, nothing changes.  It's the same feeling.  It's the same thought.  It's the same emotions.  It doesn't change.  I'm sorry.  I don't think I can ever forget that day.  I'll never be the same.

When asked about whether the experience of being terminated had given him physical symptoms, such as sweating or heart palpitations, Mitri replied:

> Every day. And - - every day it does. As I drive to work. I work for CVS now. As I drive to work, I drive by three Walgreens. Just consciously as I drive by and see that W, my hear starts racing. I turn red. It's something that I don't even have control over. Just throughout the day, if it's slow and I'm not doing something and I'm just waiting for a prescription or it's the end of the day I'll sit there and a technician will look at me and just say Sami, are you okay? And I'll say, yeah, why? And she'll say, well you just look so sad. And it's because I'm thinking of that day and every day, I think of that day, every single day. I think of that day. And many technicians have noticed that I don't want them to feel sorry for them - - for me. I don't want them to pity me. So I try after they make that comment to make an effort to say, no no, I'm okay. I'm okay. It's fine. I didn't sleep good last night or I'll make up some excuse. I've gone to see a doctor since then. My wife saw this in me from the very on set and she said, Sami, something's wrong. You need to see a doctor. And I said no, no I don't want to go. I don't want to go. I was embarrassed. I was humiliated. I didn't want to talk to about it to anyone. I thought I would be able to get over it. I thought I would get better. But I didn't. It just kept getting worse and worse and worse, and she kept telling me, Sami, I'll call for you. I'll make an appointment for you, but please go. And then finally, I believe it was November of that year, maybe 8 months later, I don't remember, 8, 9 months later, I was in a Jack In The Box in Hanford. Going to work at a Save Mart store there in Hanford. I was standing in line . . . waiting to order breakfast, and I looked across the street, and there was the Walgreens in Hanford, the 24 hour Walgreens store there that I had worked at many, many times. And my heart palpitations started again and my anxiety started and I turned red and I felt faint and I felt weak and I said I can't take this any more. I just picked up my cell phone, I called my doctor. It was Dr. Kelton. And I told Dr. Kelton what had happened. I just broke down and I told him everything. And he said, Sami, I'm sorry. Do you need to go see someone right now, and I said no, I'm okay Dr. Kelton, just talking to you, it's made me feel a little bit better. . . .
>
> He (Dr. Kelton) asked me if he would - - if I would like him to call in some prescriptions for me. He mentioned an antidepressant Zoloft. And something to help me sleep. He said the other option was for him to set up an appointment for me to see a specialist. I think he said a psychiatrist or a psychologist. I don't remember. I said, you know, I don't want to just start taking medications. I don't like medications. If you could set me up with someone to talk with, I would prefer that. He said he would do that.
>
> A few weeks later, I got a call from Dr. Atwal's office, who was a psychiatrist in Fresno. I made an appointment and I went in and I sat down and spoke with him. And we had a discussion. He had me sit down. He asked me questions. We talked for about half an hour. And he diagnosed me with depression . . . .[9]

On August 9, 2011, during cross examination, Walgreens asked Mitri the following questions related to non-economic damages:

---

[9]Walgreens objected at this point on hearsay grounds. The objection was sustained, but Walgreens neither requested that the jury disregard Mitri's answer nor moved to strike his answer regarding a diagnosis of depression. Cf. Doc. No. 51 at § XIV(G)(2).

**Q:**   **So would you agree with me that at least as of now, you don't have any medical or emotional condition that prevents you from working full time?**

A:   I do have some medical conditions, but they - - I do my best to prevent them from interfering with my ability to work a full - - full time status.

**Q:**   **And those conditions don't keep you from working full time do they?**

A:   They make it difficult, but they don't keep me.

**Q:**   **Would you look at page 19 of you deposition please. . . . "Question: Do you currently have any kind of either medical condition or emotional condition that prevents you from working a full time schedule?  Answer: No."  And that's the deposition I took of you on July 29, 2010, correct?**

A:   While I was at Save Mart before CVS, yes.

The Court is aware of no other questions by Walgreens related to Mitri's non-economic damages.

2.   Ani Estephanian Testimony

On August 4, 2011, pharmacist Ani Estephanian testified as follows regarding Mitri's

demeanor following his termination:

**Q:**   **Okay.  And based on your observations of Sami, since his termination, have you noticed any change in the way he acts?  I'm going to put it that way.**

A:   Well, whenever I worked with him, he appeared, you know, in a very good mood, positive spirits, and . . . we all were a very good unit there.  I mean, everybody got the same jokes, everybody . . . had a very pleasant time.  Afterwards, I mean my conversations with him and me knowing him as a person, I mean everything was positive.  As for how happy he was as a person, you know, I don't think I talked to him that often enough to know exactly, but I mean, yeah, I didn't really joke with him that often, but I also didn't see him that often.  So I guess sometimes, when I was on the phone, I'd ask him, you know, like how is it going?  Are you, you know, okay?  Things of that sort.  But I don't know if there was like overall if he was like that on a daily basis.

**Q:**   **Did you ever remark to Sami that you thought he - -**

A:   I'd ask him what's wrong, you know, are you okay?  And there was never, like a reason behind it.  He just said, no, I'm  - - you know, things are going how they're going, and so there was never really a thorough answer to that.

3.   Mitri's Closing Argument

During closing on August 18, 2011, Mitri's counsel made the following argument

regarding non-economic damages:

You may wonder if Sami and I set up his testimony on emotional distress, and I'm going to tell you right now that I was as shocked as you were in many of the things he said.  Of course, we talked about how it's abuse of his case.  But did I have any idea when I asked him a question about whether he's number 2 in his

16

class if it would make his voice crack?  Did I have any idea that what would come out of him when I said did you like your job?  No, I love my job?  No.  I had zero knowledge of that, and it affected me.  And I'm kind of case hardened.  I've seen 50 cases.  I have tried 50 cases.  It was compelling to me.  I'm sure it affected you and the reason is because you can tell truth when you hear it.

. . . .

Non-economic loss is emotional distress damages.  This - - there is no perfect measure of emotional distress damages.  There is no book you can go to to measure what it means to have the obsessive thoughts that Sami has about how his life has changed or what he's lost in this job and how much it meant to him.  He had elevated himself to really the height of his profession with the kind of pride and self-confidence that you get from knowing that you are among the best at what you do, and he's had that taken from him.  And not only has had it taken from him, but he's had the company that he devoted his life to be so disloyal in all the people that he had as his social network turn their back on him.  He's lost - - I mean he's a person who was committed to his friends who he worked with and that's gone, taken from him.  They have been instructed not to meet or talk with him.  They have been told he's no longer welcome here.  And they also have stamped him.  They terminated him for cause.  And essentially they terminated him for stealing time from the company.  So they take away his social network, they slandered him and the put him into a situation where he's going to earn less for the rest of his life.  And of course he has emotional distress that will continue to haunt him.  And of course he's going to wake up at night and have to figure out some way to distract his mind from thinking about these things.  Just like always.

### 4.    Walgreens's Closing Argument

During closing on August 18, 2011, Walgreens counsel made the following argument regarding non-economic damages:

In regards to emotional distress damages, Mr. Mitri was upset that he lost his job and he should be.  He cried while telling his version of the story.  That clearly impacted some of you.  At least I think until you have heard the entire storey.  What you do now know is Mr. Mitri is working full time.  That he has no condition that prevents him from working full time.  There is no evidence that he had seen a doctor for his emotional distress, that he had ever been involuntarily committed, that he had ever been in harm to himself or others.  There is not evidence to suggest that.

. . . This is a wrongful termination case.  The damages that exist, if any, flow from the termination going forward.  So all of the testimony relating to the final written warning or things that he felt were happening prior to January 8th, that cannot be the basis for any award.

### *Discussion*

As an initial matter, there is no merit to the argument that Mitri waived his Rule 59 arguments by not objecting to the verdict before the jury's discharge.  Walgreens is correct that, if a party moves for a new trial on the basis of inconsistent jury findings, then the party must object prior to the discharge of the jury that the verdict is inconsistent, or else the issue will be

waived.  See Kode, 596 F.3d at 611.  However, Mitri's motion does not state that a new trial is

warranted because of inconsistent findings.  See id.  Instead, the motion expressly states that the

jury's finding of zero non-economic damages is against the weight of the evidence, is inadequate,

and represents a miscarriage of justice.  See Court's Docket Doc. No. 102 at 5:2-5, 5:15-16, 7:10-

11.  Unlike inconsistent verdict findings, no objection is required when the grounds for a new

trial are that the verdict is against the weight of the evidence or that the finding represents a

miscarriage of justice.  See Kode, 596 F.3d at 611.  While some of the language in Mitri's

motion may support an argument that Mitri is complaining about inconsistent findings, that is not

the express basis of the motion.  Walgreens's reading of Mitri's motion is not reasonable.

Because Ninth Circuit law establishes that an objection prior to the discharge of the jury is not

necessary for the challenges expressly advanced by Mitri, there is no waiver.  See id.

  As recited above, the evidence relating to Mitri's non-economic damages came from two

sources: Mitri and Ani Estephanian.  With respect to Estephanian, her testimony was not

particularly probative.  Estephanian indicated that Mitri was not as happy and gave "incomplete"

or evasive answers when she asked what was wrong.  However, her testimony did not indicate

how often she had spoken to Mitri nor did her testimony expressly link Mitri's demeanor to his

termination.

  With respect to Mitri's testimony, Mitri was emotional when he testified, and was in tears

on several occasions.  Mitri described depression, humiliation, increased heart rates or panic

attics, social disengagement, daily thoughts of the termination, and troubled sleep.  The substance

of Mitri's testimony showed significant emotional and physical symptoms.  Some of these

symptoms manifested themselves whenever he would see a Walgreens store, while other times

they would manifest themselves when Mitri was not sufficiently occupied with other thoughts or

tasks.  However, it does not necessarily fit within the realm of common experience that Mitri's

symptoms would persist in the manner described in terms of duration, frequency, and intensity.

Further, Mitri testified that, despite these symptoms, the first time that he spoke to a physician or

psychiatrist, or even attempted to obtain some help, was around November 2010, that is, about

ten months after the termination.  Given the symptoms as described, one would think that a

1  reasonable person would have attempted to obtain some kind of help (be it from a doctor, a

2  counselor, or clergyman) sooner than ten months after the event.

3          It is also noteworthy that no other witnesses meaningfully testified about emotional

4  distress.  Mitri testified that his wife and mother saw his emotional state on the day of his

5  termination, and he further testified that his wife could see a change in his demeanor and

6  happiness.  However, neither Mitri's wife nor his mother testified at trial.  Similarly, Mitri

7  testified that he spoke to Dr. Kelton in November and then later spoke to a psychiatrist, Dr.

8  Atwol.  Mitri's testimony indicated that these physicians recognized the emotional distress and

9  depression within Mitri.  However, neither of these physicians testified at trial.[10]

10         Walgreens did not offer evidence to directly contradict Mitri's testimony.  Instead,

11 Walgreens elicited testimony on cross examination that Mitri does not suffer from a medical or

12 emotional condition that keeps Mitri from working on a full time basis.  This testimony would

13 relate primarily to the severity of, as opposed to the existence of, non-economic damages.  That

14 is, the cross examination testimony tends to indicate that the emotional distress suffered may not

15 have been as severe as Mitri made it to appear.

16         Further, that Walgreens did not expressly contradicted Mitri's testimony is not

17 dispositive.  "[I]t has long been held that a jury may properly refuse to credit even uncontradicted

18 testimony."  Guy, 608 F.3d at 588; see Acevedo-Luis v. Pagan, 478 F.3d 35, 40 (1st Cir. 2007).

19 The notion that uncontradicted testimony must be accepted as true is an "ancient fallacy" because

20 it "overlooks the significance of the carriage, behavior, bearing, manner and appearance of a

21 witness - his demeanor - when his testimony is given orally in the presence of the trier of facts."

22 NLRB v. Howell Chevrolet Co., 204 F.2d 79, 86 (9th Cir. 1953).  Related to Howell's

23 observation, Mitri's counsel felt the need to comment about Mitri's emotional distress testimony

24 during closing argument.  As indicated above, Mitri's counsel stated to the jury that it may have

25 wondered if Mitri's emotional distress testimony was "set up" because of the testimony's

26

27

28         [10]The Court is not holding that witnesses other than Mitri were required to testify.  The Court merely notes
   that corroboration from these types of witnesses would have helped Mitri meet his burden of persuasion.

emotional nature.[11]  Mitri's counsel denied that the testimony was "set up," and admitted that he himself was "shocked" at some of the things that he heard.  Mitri's counsel then vouched for Mitri's veracity by citing his own experience in trying 50 cases.  These comments are appropriate if there is a concern that the trier of fact did not fully believe or credit Mitri's testimony because of his demeanor.  Further, if Mitri's counsel was shocked, the jury may also have been shocked, but shocked in the direction of disbelief.  For its part, the Court had doubts as it listened to Mitri's emotional distress testimony.  See Kode, 596 F.3d at 612; Landes, 833 F.2d at 1371-72.

There is no dispute that Mitri had the burden of proving his non-economic damages by a preponderance of the evidence.  There is also no dispute that the jury may believe all, none, or some of a witness's testimony.  See Ninth Circuit Model Instruction No. 1.11.  Importantly, mere doubts about the correctness of a verdict are an insufficient basis for a new trial.  See Landes, 833 F.2d at 1371-72.  Here, the nature of the symptoms, the lack of corroboration, and Mitri's emotional demeanor (as recognized by his counsel during closing argument) are bases for rejecting Mitri's non-economic damages testimony.  Cf. Acevedo-Luis, 478 F.3d at 40 (". . . as to mental and emotional distress, non-economic damages must be proven, and the proof of such damages is distinct from the proof required to show discrimination.  The only testimony plaintiff offered regarding emotional distress damages was his own testimony about feeling useless and humiliated. The jury was not required to accept his uncorroborated testimony."); Howell, 204 F.2d at 86.  In light of these considerations, and weighing the evidence for itself, the Court cannot say that it believes that the jury award is against the clear weight of the evidence or that the verdict represents a miscarriage of justice; the Court does not have a definite and firm conviction that the jury made a mistake.  See Landes, 833 F.2d at 1371-72.  Therefore, Plaintiff's Rule 59(a) motion will be denied.  See id.

## CONCLUSION

With respect to Walgreens's Rule 50(b) motion on the issue of liability, the evidence is

---

[11]Of course, the arguments of counsel are not evidence.  However, they may reflect a possible interpretation of the evidence, or they may address a suspicion about how the jury is viewing the evidence.

sufficient to establish Walgreens's liability.  It is true that there was not direct evidence that Walgreens terminated Mitri based on his complaints of fraudulent billing.  However, there is sufficient circumstantial evidence to show retaliation.  Although Walgreens presented evidence that would negate liability, the jury was not required to credit this evidence.  Thus, the Rule 50(b) motion will be denied on the issue of liability.

With respect to Walgreens's Rule 50(b) motion on the issue of punitive damages, a review of the evidence presented shows that there is insufficient evidence to establish that Robert Hasty had the ability to determine corporate policy.  The evidence at best indicated that Hasty was District Manager Guillen's supervisor.  The evidence did not actually establish or address whether Hasty could determine corporate policy.   Thus, the Rule 50(b) motion will be granted on the issue of punitive damages.

With respect to Mitri's Rule 59(a) motion, the non-economic damages evidence came almost exclusively from Mitri.  However, the jury was not required to credit his testimony on this issue.  While their may be doubts about the correctness of the jury's verdict, the Court does not have a definite and firm conviction that a mistake was made.  Thus, the Rule 59(a) motion will be denied.


Accordingly, IT IS HEREBY ORDERED that:

1.      Defendant's Rule 50(b) motion with respect to the issue of liability is DENIED;

2.      Defendant's Rule 50(b) motion with respect to punitive damages is GRANTED and

        judgement in favor of Defendant on Plaintiff's punitive damages claim shall be entered;

3.      Plaintiff's Rule 59 motion is DENIED; and

4.      The Clerk shall CLOSE this case.

IT IS SO ORDERED.

Dated:    October 27, 2011

CHIEF UNITED STATES DISTRICT JUDGE